IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HEALTH CARE SERVICE
CORPORATION, a Mutual Legal Reserve
Company,

Plaintiff,

v.

INTELLECTUAL VENTURES II LLC,
CALLAHAN CELLULAR LLC,
and OL SECURITY LLC,

Defendants.

C.A. No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY

Plaintiff Health Care Service Corporation, a Mutual Legal Reserve Company, ("HCSC") brings this Complaint for Declaratory Judgment against Defendants Intellectual Ventures II LLC ("IV II"), Callahan Cellular LLC, and OL Security LLC (collectively, "IV" or "Defendants"). HCSC alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for declaratory judgment of non-infringement and invalidity arising under the patent laws of the United States, Title 35 of the United States Code. HCSC requests this relief because IV has accused HCSC of infringing certain patents allegedly owned by IV or its subsidiaries, including U.S. Patent Nos. 7,669,081 (the "081 Patent"), 7,930,287 (the "287 Patent"), 8,266,124 (the "124 Patent"), 8,332,844 (the "844 Patent"), and 8,352,584 (the "584 Patent") (collectively, the "DJ Patents;" attached as Exs. 1-5 hereto), by the alleged use of certain software, including third-party software known as Spark, Kubernetes, Elasticsearch, and Docker. IV has threatened to sue HCSC under the DJ Patents if HCSC does not pay IV a license fee.

1

2.     HCSC, however, has not and does not infringe any claim of the DJ Patents, and HCSC is not required to pay IV a license fee. IV's assertion of the DJ Patents against HCSC is impacting HCSC's business and relationships with its vendors and customers, creating a justiciable controversy between HCSC and IV. A judicial declaration is necessary and appropriate so that HCSC may ascertain its rights with respect to the DJ Patents.

## THE PARTIES

3.     Plaintiff Health Care Service Corporation is a Mutual Legal Reserve Company organized under the laws of the State of Illinois, with a principal place of business located at 300 E Randolph St. Chicago, IL 60601.

4.     On information and belief, Defendant Intellectual Ventures II LLC is a Delaware limited liability company, with its principal place of business located at 3150 139th Avenue SE, Bellevue, Washington 98005.

5.     On information and belief, Defendant Callahan Cellular LLC is a Delaware limited liability company, with its principal place of business located at 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808.

6.     On information and belief, Defendant OL Security LLC is a Delaware limited liability company, with its principal place of business located at 160 Greentree Drive Suite 101 Dover, Delaware 19904.

## JURISDICTION AND VENUE

7.     This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and under the patent laws of the United States, 35 U.S.C. § 1, et seq.

8.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338, 2201, and 2202. An actual, substantial, immediate, and continuing controversy exists

between IV and HCSC that requires a declaration of rights by this Court regarding the DJ Patents because the IV defendants have: (1) accused HCSC of infringing the DJ Patents; (2) threatened to take steps necessary to protect IV's patent rights; (3) demanded from HCSC a licensing payment; and (4) shown a history of litigation against accused infringers who are similarly situated to HCSC. However, HCSC has not and does not infringe any of the DJ Patents, and HCSC is not required to pay IV for a license to the DJ Patents. IV's actions have created a real, live, immediate, and justiciable dispute between HCSC and IV as to whether HCSC infringes the DJ Patents and whether the DJ Patents are valid and enforceable. HCSC also understands, and alleges upon information and belief, that IV has filed numerous lawsuits against other companies asserting the DJ Patents based on those companies' use of the same software IV accuses HCSC of infringing. HCSC further understands, and alleges upon information and belief, that IV is currently and actively seeking license payments from or otherwise asserting the DJ Patents against, additional parties that IV has not yet sued, but accuses of infringing the DJ Patents through use of the same software.

9.      This Court has personal jurisdiction over each Defendant under the laws of this State and consistent with the underlying due process principles of the United States Constitution, including because each Defendant is incorporated in, does business in, or has otherwise purposefully availed itself of the laws of the State of Delaware.

10.     This Court has personal jurisdiction over IV II under the laws of this State and consistent with the underlying due process principles of the United States Constitution. IV II also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

11.     This Court has personal jurisdiction over Callahan Cellular LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. Callahan Cellular LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

12.     This Court has personal jurisdiction over OL Security LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. OL Security LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

13.     On information and belief, the IV entities also have entered into licensing agreements for the use of their patents in Delaware, and they have each sent other cease and desist letters into the forum to other entities regarding their patents.

14.     Venue is proper in this judicial district under at least 28 U.S.C. § 1391(b) and (c) because each Defendant is a resident of, incorporated in, or subject to personal jurisdiction in this District.

## THE DJ PATENTS

15.     IV II alleges it is the owner or assignee of the 584 and 844 Patents. *See, e.g.*, *The Travelers Indem. Co. v. IV*, No. 1:26-cv-397 (D. Del.) ("*Travelers DJ Action*"), D.I. 1-18 at 2. As noted previously, the 584 and 844 Patents are attached as Exs. 5 and 4 respectively.

16.     IV alleges that Callahan Cellular, LLC is a wholly owned subsidiary of the IV entities and that Callahan Cellular, LLC is the assignee of the 124 Patent. *See, e.g.*, *Travelers DJ Action*, D.I. 1-18 at 2. As noted previously, the 124 Patent is attached as Ex. 3.

17.     IV alleges that OL Security LLC is a wholly owned subsidiary of the IV entities and that OL Security LLC is the assignee of the 081 and 287 Patents. *See, e.g.*, *Travelers DJ*

*Action*, D.I. 1-18 at 2. As noted previously, the 081 and 287 Patents are attached as Exs. 1 and 2 respectively.

## FACTUAL BACKGROUND

18.     IV is in the business of monetizing patents, including through licensing campaigns and by filing patent litigations. IV's typical approach includes engaging in licensing campaigns targeting a given set of companies, repeatedly contacting target companies, attempting to negotiate licenses with companies that respond, and filing – and aggressively pursuing – patent litigation against companies that decline to engage or pay IV to license IV's patents. This strategy is designed to apply sustained pressure, to use litigation as leverage, and to extract substantial portfolio-level license fees irrespective of whether the asserted patents are actually infringed, valid, or enforceable.

19.     IV does not practice the DJ Patents and has not created products, jobs, or technological advances based on the claimed inventions. Rewarding its licensing campaigns in the absence of infringement undermines the patent system's innovation incentives and imposes unwarranted costs on entities that devote resources to productive economic activity.

20.     HCSC has five unincorporated divisions under which it does business, comprised of Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of Montana, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of New Mexico.

21.     HCSC is a leading health insurer in the United States, offering health insurance policies to individuals and employers in five states. HCSC is also hired by employers and self-funded employee health benefit plans to serve as the plans' claims administrator. These employers include governmental employers such as state and local governments. HCSC also administers

benefits for federal employees, and serves as a Medicaid managed care organization and provides Medicare Advantage plans. In all these roles, HCSC is subject to considerable administrative, compliance, and operational costs. HCSC strives to operate efficiently and minimize administrative costs so that it can provide high-quality services to its members at the lowest possible cost.

22.     The payment of IV's aggressive and unnecessary patent licenses, as currently sought by IV, is likely to further increase HCSC's expenditures. HCSC's insured members would suffer from the additional and unwarranted costs, and its employer/plan customers would suffer from additional and unwarranted costs through increased administrative fees. Over time, HCSC's insureds and employer/plan customers may suffer further detriment due to HCSC's reduced capacity to invest in critical technology and service enhancements.

**A.     IV's Assertion of the DJ Patents Against HCSC**

23.     On February 11, 2025, IV Licensing Executive Steve Joroff, on behalf of IV, contacted HCSC, stating that IV holds a "portfolio-comprising approximately 5,000 patents" covering "technologies relevant to financial services, such as cloud computing, networking, security, storage, and open-source software." Mr. Joroff noted that 35 financial services companies had already become licensees, and pointed to recent settlements with J.P. Morgan Chase, Liberty Mutual, and Comerica as evidence of the strength and value of IV's portfolio. The purpose of Mr. Joroff's email was to schedule a meeting with HCSC to discuss IV's patent portfolio. Mr. Joroff's February 11, 2025 email is shown below.

From: Steve Joroff <sjoroff@intven.com>
Sent: Tuesday, February 11, 2025 12:10 PM
To: ofeliu@bcbs.com <ofeliu@bcbs.com>; osvaldo_feliu@bcbstx.com <osvaldo_feliu@bcbstx.com>; osvaldo_feliu@bcbsil.com <osvaldo_feliu@bcbsil.com>; osvaldo_feliu@hcsc.com <osvaldo_feliu@hcsc.com>; osvaldo.feliu@hcsc.com <osvaldo.feliu@hcsc.com>
Cc: todd_ehlman@hcsc.com <todd_ehlman@hcsc.com>; omar_kilany@hcsc.com <omar_kilany@hcsc.com>; omar.kilany@hcsc.com <omar.kilany@hcsc.com>; kilanyo@hcsc.com <kilanyo@hcsc.com>
Subject: Health Care Service Corp. Patent Licensing Discussion with Intellectual Ventures

Dear Osvaldo,

I hope this message finds you well. Allow me to introduce myself-I am Steve Joroff, Licensing Executive at Intellectual Ventures (IV). At IV, I lead a dedicated team responsible for negotiating patent license agreements, with a particular focus on the financial services sector.

I wanted to reach out to see if you might be the appropriate person to speak with regarding patent matters at Health Care Service Corp. Intellectual Ventures has an active financial services licensing program, and our portfolio-comprising approximately 5,000 patents-includes technologies relevant to financial services, such as cloud computing, networking, security, storage, and open-source software.

To date, 35 financial services companies have recognized the value and strength of the IV patent portfolio by becoming licensees. These collaborations demonstrate that we are willing and able to work with companies to find amicable solutions without resorting to litigation. At the same time, the recent settlements with JPMC, Liberty Mutual, and Comerica further highlight the strength and value of our portfolio.

If you're willing to schedule a meeting, I'd be happy to share non-confidential material about Intellectual Ventures, our patent portfolio, and the financial services licensing program.

If you are not the right person for this discussion, I would appreciate it if you could kindly forward this message to the appropriate contact.

Thank you for your time and consideration. I look forward to hearing from you!

Best,

Steve Joroff

Intellectual Ventures
E - sjoroff@intven.com
O - 425.247.2280

24.     On March 4, 2025, Mr. Joroff, on behalf of IV, followed up, stating that he had not heard back from HCSC and reiterating his request to connect and discuss IV's patent portfolio and its relevance to the financial services sector. Mr. Joroff's March 4, 2025 email is shown below.

From: Steve Joroff <sjoroff@intven.com>
Sent: Tuesday, March 4, 2025 1:01 PM
To: ofeliu@bcbs.com <ofeliu@bcbs.com>; osvaldo_feliu@bcbstx.com <osvaldo_feliu@bcbstx.com>; osvaldo_feliu@bcbsil.com <osvaldo_feliu@bcbsil.com>; osvaldo_feliu@hcsc.com <osvaldo_feliu@hcsc.com>; osvaldo.feliu@hcsc.com <osvaldo.feliu@hcsc.com>
Cc: todd_ehlman@hcsc.com <todd_ehlman@hcsc.com>; omar_kilany@hcsc.com <omar_kilany@hcsc.com>; omar.kilany@hcsc.com <omar.kilany@hcsc.com>; kilanyo@hcsc.com <kilanyo@hcsc.com>
Subject: Re: Health Care Service Corp. Patent Licensing Discussion with Intellectual Ventures

Dear Osvaldo,
I hope you're doing well.
I wanted to follow up on my note from February 11, as I haven't heard back from you yet. I'd still appreciate the opportunity to connect and discuss Intellectual Ventures, our patent portfolio, and its relevance to the financial services sector.
To make scheduling easier, here are some available time slots for a meeting:

*     Monday, March 10: 10:00 AM - 3:00 PM ET
*     Tuesday, March 11: 10:00 AM - 2:30 PM ET
*     Thursday, March 13: 10:00 AM - 2:00 PM ET

Please let me know if any of these times work for you, or if there's a more convenient time that fits your schedule. Once we have a meeting calendared, I'd be happy to share some non-confidential material about Intellectual Ventures, our patent portfolio, and its relevance to financial services companies.
Looking forward to your response.
Best,
Steve Joroff
Intellectual Ventures

25.     On April 4, 2025, Mr. Joroff, on behalf of IV, escalated IV's demands, stating that "IV holds a portfolio of approximately 4,800 patents, many of which are highly relevant to financial services sector-including technologies related to cloud infrastructure, open-source software, security, and data systems." Mr. Joroff also represented that IV had "begun taking legal action where companies have chosen not to engage," specifically referencing filed patent infringement lawsuits against Nationwide Mutual Insurance and The Bank of New York Mellon. Mr. Joroff requested that HCSC identify the appropriate person to speak with regarding the need for a license "[t]o avoid a similar outcome." Mr. Joroff's April 4, 2025 email is shown below.

> From: Steve Joroff <sjoroff@intven.com>
> Sent: Friday, April 4, 2025 1:25 PM
> To: osvaldo_feliu@bcbstx.com <osvaldo_feliu@bcbstx.com>; osvaldo_feliu@bcbsil.com <osvaldo_feliu@bcbsil.com>; osvaldo_feliu@hcsc.com <osvaldo_feliu@hcsc.com>; osvaldo.feliu@hcsc.com <osvaldo.feliu@hcsc.com>
> Cc: todd_ehlman@hcsc.com <todd_ehlman@hcsc.com>; omar_kilany@hcsc.com <omar_kilany@hcsc.com>; omar.kilany@hcsc.com <omar.kilany@hcsc.com>; kilanyo@hcsc.com <kilanyo@hcsc.com>
> Subject: Re: Health Care Service Corp. Patent Licensing Discussion with Intellectual Ventures
>
> Dear Osvaldo,
> I'm following up on my earlier outreach regarding Intellectual Ventures' (IV) financial services patent licensing program. As mentioned previously, IV holds a port-folio of approximately 4,800 patents, many of which are highly relevant to the financial services sector-including technologies related to cloud infrastructure, open-source software, security, and data systems.
> We have now successfully licensed 35 financial services companies, and while we continue to resolve matters constructively where possible, we have also begun taking legal action where companies have chosen not to engage. Specifically, IV recently filed two new patent litigations-against Nationwide Mutual Insurance and The Bank of New York Mellon-after repeated outreach attempts failed to result in meaningful dialogue.
> To avoid a similar outcome, I respectfully ask that you identify the appropriate person to speak with me regarding the need for a license. Once connected, I'd be happy to schedule a short meeting to provide background on our program and the relevant technologies at issue.
> I look forward to your response.
> Best,
> Steve Joroff
> Intellectual Ventures

26.     Mr. Joroff's original emails had been captured by HCSC's spam filters, and in response to correspondence from HCSC's outside counsel, on June 20, 2025, Mr. Joroff, on behalf of IV, sent to HCSC's outside counsel a zip file containing six exemplary claim charts, each mapping specific IV patents to technologies allegedly in use at HCSC.

27.     IV's first claim chart included allegations that HCSC infringes claim 1 of the 081 Patent through HCSC's use of third-party software Apache Spark. This chart was marked "IV PROPRIETARY – SUBJECT TO FRE 408 (CONFIDENTIAL SETTLEMENT COMMUNICATION)" (the "081 Claim Chart").

28.     IV's second claim chart included allegations that HCSC infringes claim 28 of the 287 Patent through HCSC's use of third-party software Elasticsearch. This chart was marked "IV PROPRIETARY – SUBJECT TO FRE 408 (CONFIDENTIAL SETTLEMENT COMMUNICATION)" (the "287 Claim Chart").

29.     IV's third claim chart included allegations that HCSC infringes claim 1 of the 124 Patent through HCSC's use of third-party software Kubernetes. This chart was marked "IV PROPRIETARY – SUBJECT TO FRE 408 (CONFIDENTIAL SETTLEMENT COMMUNICATION)" (the "124 Claim Chart").

30.     IV's fourth claim chart included allegations that HCSC infringes claim 7 of the 844 Patent through HCSC's use of third-party software Docker. This chart was marked "IV PROPRIETARY – SUBJECT TO FRE 408 (CONFIDENTIAL SETTLEMENT COMMUNICATION)" (the "844 Claim Chart").

31.     IV's fifth claim chart included allegations that HCSC infringes claim 1 of the 584 Patent through HCSC's use of third-party software Kubernetes. This chart was marked "IV PROPRIETARY – SUBJECT TO FRE 408 (CONFIDENTIAL SETTLEMENT COMMUNICATION)" (the "584 Claim Chart").

32.     On March 26, 2026, IV filed a patent infringement lawsuit against Government Employees Insurance Company, which asserted, among others, the 844 Patent and the 584 Patent.

**B.     IV's Infringement Allegations Against the Products Accused at HCSC**

33.     IV has filed patent infringement complaints against at least 10 companies to date asserting infringement of many of the DJ Patents by the same third-party software products IV has accused at HCSC. IV's infringement allegations, as discussed below, focus on off-the-shelf/built-

in functionality in the underlying accused software products, not on any feature, customization, or configuration unique to HCSC or any other accused defendant.

34. IV accuses the following third-party software at HCSC of infringement:

a. IV asserts the 081 Patent against Apache Spark ("Spark")

b. IV asserts the 287 Patent against Elasticsearch

c. IV asserts the 124 Patent against Kubernetes

d. IV asserts the 844 Patent against Docker

e. IV asserts the 584 Patent against Kubernetes

35. IV does not allege HCSC makes the underlying accused Spark, Elasticsearch, Kubernetes, or Docker software. Rather, the software and products that IV accused of infringement are allegedly provided by third parties or are open source, and IV alleges HCSC uses the accused software and products. IV has filed several waves of litigation asserting the DJ Patents and other patents accusing the exact same third-party software IV accuses at HCSC, as summarized below:

| # | Case | Accused Products |
|---|---|---|
| 1 | *Intellectual Ventures I LLC v. Liberty Mutual Holding Co.*, No. 2:23-cv-00525 (E.D. Tex. Nov. 15, 2023) | • 844 Patent v. Docker |
| 2 | *Intellectual Ventures I LLC v. Comerica Inc.*, No. 2:23-cv-00524 (E.D. Tex. Nov. 15, 2023) | • 844 Patent v. Docker |
| 3 | *Intellectual Ventures I LLC v. JP Morgan Chase Bank, N.A.*, No. 2:23-cv-00523 (E.D. Tex. Nov. 15, 2023) | • 844 Patent v. Docker |
| 4 | *Intellectual Ventures I LLC v. Southwest Airlines Co.*, No. 7:24-cv-00277 (W.D. Tex. Nov. 2, 2024). | • 844 Patent v. Docker<br>• 584 Patent v. Kubernetes |
| 5 | *Intellectual Ventures I LLC v. American Airlines, Inc.*, No. 4:24-cv-00980 (E.D. Tex. Nov. 2, 2024) | • 844 Patent v. Docker<br>• 584 Patent v. Kubernetes |
| 6 | *Intellectual Ventures I LLC v. Nationwide Mutual Insurance Co.*, No. 3:25-cv-00632 (N.D. Tex. Mar. 15, 2025) | • 844 Patent v. Docker |

| 7 | *Intellectual Ventures I LLC v. Bank of New York Mellon Corp.*, No. 3:25-cv-00631 (N.D. Tex. Mar. 15, 2025) | • 844 Patent v. Docker<br>• 584 Patent v. Kubernetes |
|---|---|---|
| 8 | *Intellectual Ventures I LLC v. Home Depot, Inc.*, No. 1:25-cv-01147 (W.D. Tex. Jul. 23, 2025) | • 844 Patent v. Docker<br>• 584 Patent v. Kubernetes |
| 9 | *Intellectual Ventures I LLC v. Deere & Co.*, No. 1:26-cv-00425 (W.D. Tex. Feb. 23, 2026) | • 844 Patent v. Docker<br>• 584 Patent v. Kubernetes |
| 10 | *Intellectual Ventures I LLC v. Government Employees Insurance Co.*, No. 3:26-cv-00978 (N.D. Tex. Mar. 26, 2026) | • 844 Patent v. Docker<br>• 584 Patent v. Kubernetes |

36.     IV's infringement allegations against the third-party Docker and Kubernetes, software that IV accuses at HCSC are illustrated by claim charts IV has filed in IV's recent litigation campaigns accusing the third-party software of infringement. *See, e.g.*:

a.   *IV v. Nationwide* (attached as Ex. 6 hereto): IV's infringement claim chart for the 844 Patent vs. Docker

b.   *IV v. Bank of New York Mellon* (attached as Ex. 7 hereto): IV's infringement claim chart for the 584 Patent vs. Kubernetes

37.     As IV's claim charts show, IV's allegations focus on the underlying third-party Docker and Kubernetes software itself to allege infringement. *See* Exs. 6-7.

<u>COUNT I</u>
<u>DECLARATION OF NON-INFRINGEMENT OF THE 081 PATENT</u>

38.     HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

39.     The 081 Patent is titled "Systems and Methods for Scheduling, Processing, and Monitoring Tasks." The 081 Patent's Abstract states:

A computer-implemented method for performing a process is provided. The method comprises: (a) receiving a request to perform a process, the process comprising a plurality of tasks and at least a scheduler rule; (b) receiving a plurality of checkpoints associated with the process, each checkpoint comprising checkpoint state data and at least a respective checkpoint rule governing execution of the

11

process; (c) determining a first task of the plurality of tasks to be scheduled into a priority queue, in accordance with the scheduler rule; (d) determining the first checkpoint of the plurality of checkpoints that is to be the first checkpoint used in processing the first task, in accordance with the scheduler rule; (e) creating the checkpoint state data for the first checkpoint; (f) saving the checkpoint state data for the first checkpoint; (g) processing the first task in accordance with the checkpoint rule associated with the first checkpoint; (h) determining the next task in the plurality of tasks to perform, based on the checkpoint rule associated with the first checkpoint; (i) updating the saved checkpoint data for the first checkpoint with the data and state associated with the first task; and (j) repeating steps (c) through (i) for each subsequent task and checkpoint, in accordance with the respective scheduler and checkpoint rules, until a predetermined condition has been reached.

40.     IV has asserted that third-party software called Spark that IV alleges HCSC is using (the "081 Accused System") infringes the 081 Patent. 081 Claim Chart.

41.     Contrary to IV's assertions, HCSC has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 081 Patent, including through any making, use, offering to sell, selling, and/or importing of the 081 Accused System or Spark, at least because the 081 Accused System and Spark do not employ, incorporate, use, or otherwise include all of the limitations of the 081 Patent's claims.

42.     Although there are additional reasons why HCSC, the 081 Accused System, and Spark do not infringe the 081 Patent, non-limiting examples are discussed below.

43.     IV has only identified independent Claim 1 of the 081 Patent as asserted. Claim 1 recites:

1. A computer-implemented method for performing a process, the method comprising:
        (a) receiving a request to perform a process, the process having a state and comprising a plurality of tasks and at least a scheduler rule;
        (b) receiving a plurality of checkpoints associated with the process, each checkpoint comprising checkpoint state data and at least a respective checkpoint rule governing execution of the process, wherein the checkpoint state data comprises information about the state of the process and wherein the checkpoint

rule defines, based at least in part on at least one of the checkpoint state data and a first predetermined condition, one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute;

(c) determining a first task of the plurality of tasks to be scheduled into a priority queue, in accordance with the scheduler rule;

(d) determining the first checkpoint of the plurality of checkpoints that is to be the first checkpoint used in processing the first task, in accordance with the scheduler rule;

(e) creating the checkpoint state data for the first checkpoint; and

(f) saving the checkpoint state data for the first checkpoint.

44.    With respect to Claim 1's limitation "each checkpoint comprising state data and at least a respective checkpoint rule governing execution of the process ... [that] defines ... one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute," the 081 specification states "each process can be divided into checkpoints 136 (e.g., checkpoints 136A, 136B, and 136D of FIG. 3)" and "[e]ach checkpoint 136 effectively has 'intelligence' because the checkpoint includes and is associated with one or more rules that tell how the checkpoint 136 is to proceed." *See, e.g.*, 081 Patent 12:18-22. The "rule[s (e.g., 'developer-provided rules' or 'strategy patterns')] encapsulate[] the decision making necessary for selecting the next processor function." *Id.* 4:16-20.

45.    The 081 Accused System and Spark do not infringe the 081 Patent at least because they lack a checkpoint comprising a "checkpoint rule governing execution of the process ... [that] defines ... one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute." Spark documentation states that "RDD.checkpoint()" will "[m]ark this RDD for checkpointing," so the RDD "will be saved to a file ... and all references to its parent RDDs will be removed." *See* https://spark.apache.org/docs/latest/api/python/reference/api/pyspark.RDD.checkpoint.html. "Resilient distributed dataset" (RDD) checkpoints do not contain instructions or rules governing execution of a process that define one or more of the plurality of tasks to be executed and the way

in which the one or more tasks will execute. *See, e.g., id*. For example, the documentation below describes checkpointing the RDD "nums" and recovering that checkpoint to "numsRecovered:"

```
import org.apache.spark.sql.functions.rand
val nums = spark.range(5).withColumn("random",
rand()).filter($"random" > 0.5)
scala> nums.show
+---+------------------+
| id|            random|
+---+------------------+
|  0| 0.752877642067488|
|  1|0.5271005540026181|
+---+------------------+

...

// Set org.apache.spark.rdd.ReliableRDDCheckpointData logger to INFO
// to see what happens while an RDD is checkpointed
// Let's use log4j API
import org.apache.log4j.{Level, Logger}
Logger.getLogger("org.apache.spark.rdd.ReliableRDDCheckpointData").
setLevel(Level.INFO)

scala> nums.checkpoint
18/03/23 00:05:15 INFO ReliableRDDCheckpointData: Done checkpointing
RDD 12 to file:/tmp/checkpoints/b1f413dc-3eaf-46a0-99de-
d795252035e0/rdd-12, new parent is RDD 13
res7: org.apache.spark.sql.Dataset[org.apache.spark.sql.Row] = [id:
bigint, random: double]

...
```

```
// Recover nums dataset from the checkpoint files
// Start from recovering the underlying RDD
// And create a Dataset based on the RDD

...

import org.apache.spark.sql.my2
val numsRecovered = my2.createDataFrame(spark, numsRddRecovered,
schema)
scala> numsRecovered.show
+---+------------------+
| id|            random|
+---+------------------+
|  0| 0.752877642067488|
|  1|0.5271005540026181|
+---+------------------+
```

*See* https://books.japila.pl/spark-sql-internals/checkpointing/ (excerpted).

46.    At least because of the absence of a checkpoint comprising a "checkpoint rule governing execution of the process ... [that] defines ... one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute" as discussed above, HCSC does not directly infringe the 081 Patent, either literally or under the doctrine of equivalents.

47.     Likewise, at least because there is no direct infringement, HCSC does not indirectly infringe the 081 Patent, including no induced or contributory infringement of the 081 Patent.

48.     Absent a declaration of non-infringement, IV will continue to wrongfully allege that HCSC infringes the 081 Patent and thereby cause HCSC irreparable injury and damage.

49.     For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between HCSC and IV regarding whether HCSC infringes or has infringed the 081 Patent.

50.     HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that HCSC (including through its alleged use of the 081 Accused System and Spark) does not infringe the 081 Patent.

## COUNT II
## DECLARATION OF INVALIDITY OF THE 081 PATENT

51.     HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

52.     Each claim of the 081 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. § 1, et seq., including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112. More specifically, and without limitation, the claims of the 081 Patent are invalid under 35 U.S.C. § 101 for lack of patentable subject matter. The claims of the 081 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because they are anticipated or rendered obvious by relevant prior art, including but not limited to the prior art of record during prosecution of the 081 Patent, and/or additional prior art that will be identified during discovery in this case. The claims of the 081 Patent are also invalid under 35 U.S.C. § 112(a)/first paragraph because the specification does not contain a written description of the claimed invention sufficient to enable any person skilled in the art to which it pertains. The claims of the 081 Patent are also invalid under 35 U.S.C.

15

§ 112(b)/second paragraph because the claims do not particularly point out and distinctly claim the subject matter regarded as the invention.

53.     HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that the claims of the 081 Patent are invalid.

### COUNT III
### DECLARATION OF NON-INFRINGEMENT OF THE 287 PATENT

54.     HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

55.     The 287 Patent is titled "Systems and Methods for Compound Searching." The 287 Patent's Abstract states:

> A search service includes a network-connected server, a data repository coupled to the first server, and software resident in the data repository and executing on the first server. The service, through the software, presents an interactive interface to a user, determines, through iterative interaction with the user a purpose for a search, develops search criteria for the search, enters the criteria to one or more standard search engines accessible through the network, and collects results of the search on behalf of the user.

56.     IV has asserted that third-party software called Elasticsearch that IV alleges HCSC is using (the "287 Accused System") infringes one or more claims of the 287 Patent. 287 Claim Chart.

57.     Contrary to IV's assertions, HCSC has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 287 Patent, including through any making, use, offering to sell, selling, and/or importing of the 287 Accused System or Elasticsearch, at least because the 287 Accused System and Elasticsearch do not employ, incorporate, or otherwise make use of all of the limitations of the 287 Patent's claims.

58.    Although there are additional reasons why HCSC, the 287 Accused System, and Elasticsearch do not infringe any claim of the 287 Patent, several non-limiting examples are discussed below.

59.    IV has only identified independent claim 28 of the 287 Patent as asserted. Claim 28 recites:

> 28. A system, comprising:
>     a network interface configured to connect to a network-coupled server that provides a search service; and
>     display hardware configured to present an interactive interface that is supplied by the search service, wherein the interactive interface is configured to iteratively collect input including at least one term related to a description of a search to refine a purpose for the search, and further configured to request and receive at least one first clarification related to the at least one term, and to send the at least one first clarification to the search service, and further configured to, in response to receiving the first clarification, request and receive at least one second clarification related to the at least one term, and to send the second clarification to the search service.

60.    With respect to Claim 28's limitation of "display hardware configured to present an interactive interface that is supplied by the search service," the 287 Patent Specification describes the claimed system as client-side hardware (mobile appliance, laptop, or desktop computer) that receives and displays a full conversational, iterative interface supplied by the remote search service. *See, e.g.*, 287 Patent 7:13-45 ("In an embodiment of the present invention a user is directed to describe to the service the nature of the information desired, in more detail than in conventional search services, and in context… The interface will typically be a text entry window, but may be voice enabled in some embodiments, and there may be multiple choice questions to be answered."); *See also id.* at 7:9-12 ("Typically, in a standard search engine interactive page, there is a single entry window…" (contrasting the claimed multi-step dialog)). The specification's example shows the service itself supplying Yes/No clarification questions on the client display hardware after the user enters a paragraph description (e.g., "We determine the

17

main focus is Abraham Lincoln" Yes/No; "A secondary focus is his assassination" Yes/No, followed by a further clarification question). *See also id.* at 7:32-40.

61.     The 287 Accused System and Elasticsearch do not infringe the 287 Patent at least because they lack a "display hardware configured to present an interactive interface that is supplied by the search service." Documentation indicates that Elasticsearch is accessed via software HTTP REST APIs for one-shot queries and returns results; Elasticsearch does not supply or include any display hardware or user-facing interactive interface. *See, e.g.,* https://www.elastic.co/docs/reference/elasticsearch/rest-apis (Elasticsearch core functionality is the RESTful search API); https://www.elastic.co/search-labs/blog/elasticsearch-autocomplete-search (any suggestion or autocomplete features are implemented through the search API, not as a supplied client interface). Documentation consistently describes Elasticsearch as server/cluster software that clients or separate front-end applications connect to via software API calls. *See also* https://medium.com/@ramekris/enterprise-search-using-elasticsearch-19d35dacae15 (Fig. 1 showing Elasticsearch as backend only).



**Figure 1:** Enterprise Search using ElasticSearch for a SaaS Platform

62.     The 287 Accused System and Elasticsearch also do not infringe the 287 Patent because, among other things, Elasticsearch does not meet the limitations of "wherein the

interactive interface is configured to iteratively collect input… to refine a purpose for the search," "and further configured to request and receive at least one first clarification related to the at least one term, and to send the at least one first clarification to the search service," and "and further configured to, in response to receiving the first clarification, request and receive at least one second clarification related to the at least one term, and to send the second clarification to the search service," where the search service supplies the specific multi-turn clarification dialog described in the specification. Documentation states that Elasticsearch provides REST API responses to direct queries submitted by clients; Elasticsearch does not supply or drive the claimed iterative clarification loop on client display hardware, via first or second clarifications, or otherwise.

63.    The 287 Accused System and Elasticsearch also do not meet the limitations of Claim 28 because they do not function as an intermediary "search service" that, after refining purpose via the claimed interface, "develops search criteria" and "enters the criteria to one or more standard search engines" accessible through the network, as described in the 287 Patent Abstract and Specification at steps 404-406 of Figure 4 below. Elasticsearch does not sit upstream of other search engines such as Google or Yahoo in the manner required by the patent.

19



Fig. 4

64.     At least because of the absence of "display hardware configured to present an interactive interface that is supplied by the search service," "wherein the interactive interface is configured to iteratively collect input… to refine a purpose for the search," "and further configured to request and receive at least one first clarification related to the at least one term, and to send the at least one first clarification to the search service," and "and further configured to, in response to receiving the first clarification, request and receive at least one second clarification related to the at least one term, and to send the second clarification to the search service" as discussed above, HCSC does not directly infringe the 287 Patent, either literally or under the doctrine of equivalents. Likewise, at least because there is no direct infringement, HCSC does not indirectly infringe the 287 Patent, including no induced or contributory infringement of the 287 Patent.

65.     Absent a declaration of non-infringement, IV will continue to wrongfully allege that HCSC infringes the 287 Patent, and thereby cause HCSC irreparable injury and damage.

66. For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between HCSC and IV regarding whether HCSC infringes or has infringed the 287 Patent.

67. HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that HCSC (including through its alleged use of the 287 Accused System and Elasticsearch) does not infringe the 287 Patent.

## COUNT IV
## DECLARATION OF INVALIDITY OF THE 287 PATENT

68. HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

69. Each claim of the 287 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. § 1, et seq., including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112. More specifically, and without limitation, the claims of the 287 Patent are invalid under 35 U.S.C. § 101 for lack of patentable subject matter. The claims of the 287 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because they are anticipated or rendered obvious by relevant prior art, including but not limited to the prior art of record during prosecution of the 287 Patent, and/or additional prior art that will be identified during discovery in this case. The claims of the 287 Patent are also invalid under 35 U.S.C. § 112(a)/first paragraph because the specification does not contain a written description of the claimed invention sufficient to enable any person skilled in the art to which it pertains. The claims of the 287 Patent are also invalid under 35 U.S.C. § 112(b)/second paragraph because the claims do not particularly point out and distinctly claim the subject matter regarded as the invention.

70. HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that the claims of the 287 Patent are invalid.

21

## COUNT V
## DECLARATION OF NON-INFRINGEMENT OF THE 124 PATENT

71.    HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

72.    The 124 Patent is titled "Integrated Asset Management." The 124 Patent's Abstract states:

> The method and system of the present invention provides an improved technique for integrated asset management. Information is aggregated from a variety of sources into a centralized computerized database. Thereafter, asset transition events are scheduled. Information from the centralized computerized database is used in the performance of the asset transition events and information relating to the asset transition events is added to the centralized computerized database. Subsequent changes to the asset are also recorded into the centralized computerized database. As a result, a plethora of information is available within said database for the purpose of managing future asset transition events.

73.    IV has asserted that third-party software called Kubernetes that IV alleges HCSC is using (the "124 Accused System") infringes the 124 Patent. In its claim chart, IV asserts that HCSC makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import the 124 Accused System in a manner that infringes Claim 1 of the 124 Patent. 124 Claim Chart.

74.    Contrary to IV's assertions, HCSC has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 124 Patent, including through any making, use, offering to sell, selling, importing, and/or encouraging the making, using, selling, offering to sell, and/or importation of the 124 Accused System or Kubernetes, at least because the 124 Accused System and Kubernetes do not employ, incorporate, use, or otherwise include all of the limitations of the 124 Patent's claims.

75.    Although there are additional reasons why HCSC, the 124 Accused System, and Kubernetes do not infringe the 124 Patent, non-limiting examples are discussed below.

22

76.    IV has only identified independent Claim 1 of the 124 Patent as asserted. Claim 1 recites:

1. A method comprising:
    receiving an indication of an occurrence of at least one transition event performed for at least one of a plurality of computer-related hardware devices, wherein the plurality of computer-related hardware devices include respective processors;
    recording information from the transition event into a centralized computerized database;
    monitoring for at least one change to the plurality of computer-related hardware devices and recording information associated with the change into the centralized computerized database; and
    managing at least one additional transition event for at least one of the plurality of computer related hardware devices using information available in the centralized computerized database.

77.    Claim 1 requires a method focused on physical "computer-related hardware devices" (e.g., desktops, laptops, printers with processors) and their "transition events" (e.g., physical installation, relocation, disposition, maintenance). For example, Claim 1 expressly requires "receiving an indication of an occurrence of at least one transition event performed for at least one of a plurality of computer-related hardware devices ...," expressly limiting the claimed step to being performed for physical computer-related hardware devices.

78.    This limitation requiring physical computer-related hardware devices is repeated and reinforced in multiple subsequent steps of Claim 1, including: "monitoring for at least one change to the plurality of computer-related hardware devices" and "managing at least one additional transition event for at least one of the plurality of computer related hardware devices." The plain language of Claim 1 thus makes clear that the claimed invention is limited to methods involving physical hardware assets and their physical transition events, not software programs, virtual resources, or software updates.

79.     During prosecution of the 124 Patent, the patentee, in response to an office action rejecting the claims over prior art, limited the alleged invention to a physical hardware device, expressly disclaiming software or any virtualized process or non-physical device. *See* Patentee's Office Action Response dated 2/18/2009 at 15 (attached as Ex. 8 hereto) ("Applicant respectfully submits that a software program is not a computer-related hardware device that includes a processor, as claimed.") shown below:

> In making out the rejection of this claim, the Office argues that claim 1 is anticipated by Nakamura. Applicant has amended claim 1 to recite a plurality of computer-related hardware ***devices***, wherein each of the plurality of computer-related hardware devices ***includes a processor***. Applicant respectfully submits that Nakamura does not teach or in any way suggest performing a transition event for at least one of a plurality of computer-related hardware devices that each includes a processor, as recited in claim 1. Rather, Nakamura discusses the production of "products", such as a software "program". (*Nakamura*, column 1, line 38). Applicant respectfully submits that a software program is not a computer-related hardware device that includes a processor, as claimed.

80.     Patentee reiterated this physical hardware limitation in a subsequent appeal, where it argued again that the patent's claimed "transition event" (e.g., "an asset installation, asset relocation, asset disposition or asset maintenance activity," see 124 Patent 2:51-52) does not and could not include "an update to a program or software in a computer," or a "change" to a "data element." *See* Patentee/Appellant Reply Brief at 3-4, dated December 9, 2010 (attached as Ex. 9 hereto) shown below:

> This statement by the Office [about the prior art] clarifies that the Office considers that an 'update to a program or software in a computer' or a 'change' to a 'data element' anticipates a 'transition event,' as claimed. It is respectfully submitted, however, that an 'update to a program or software in a computer' or a 'change' to a 'data element' cannot be considered a 'transition event', as claimed and described in Appellant's specification. Appellant notes that 'computer-related hardware devices', as described in the specification, may include without limitation 'desktop

24

computers, laptop computers, handheld computers, printers, scanners, networking devices and storage devices' (*Appellant's specification*, page 9, lines 2 and 3).

A 'transition event', as described in the specification, may include without limitation 'an asset installation, asset relocation, asset disposition or asset maintenance activity' (*Appellant's specification*, page 5, line 23 to page 6, line 1). Therefore, an 'update to a program' simply does not disclose, teach, or in any way suggest 'receiving an indication of an occurrence of at least one ***transition event*** performed for at least one of a plurality of ***computer-related hardware devices***', as claimed.

The Board of Patent Appeals and Interferences accepted Patentee's argument, finding that the prior art at issue did not disclose "receiving an indication of a transition event (i.e., an occurrence of a change) performed for a computer-related hardware device." *See* Board Decision at 4, dated February 24, 2012 (attached as Ex. 10 hereto).

81.     The 124 Accused System and Kubernetes do not infringe the 124 Patent because Kubernetes, among other things, does not perform Claim 1's step of "receiving an indication of an occurrence of at least one transition event performed for at least one of a plurality of computer-related hardware devices." For example, the Kubernetes's documentation explains that "Kubernetes operates at the container level rather than at the hardware level . . . ." *See* https://kubernetes.io/docs/concepts/overview/ ("Kubernetes is a portable, extensible, open source platform for managing containerized workloads and services.") As illustrated below and explained in the documentation, Kubernetes is "decoupled from the underlying infrastructure" hardware and "raises the level of abstraction from running an OS on virtual hardware to running an application on an OS using logical resources." *Id*.

25



*Id*. In Kubernetes, "a set of worker machines, called nodes, [] run containerized applications. Every cluster needs at least one worker node in order to run . . . ." *See* https://kubernetes.io/docs/concepts/architecture. "A node may be a virtual or physical machine," but "Kubernetes creates a Node object internally (the representation)" and Kubernetes cannot differentiate between physical hardware devices (i.e., "In cases when objects represent a physical entity, like a Node representing a physical host, when the host is re-created under the same name without deleting and re-creating the Node, Kubernetes treats the new host as the old one ..."). *See* https://kubernetes.io/docs/concepts/architecture/nodes; https://kubernetes.io/docs/concepts/overview/working-with-objects/names.        Therefore, Kubernetes cannot and does not satisfy Claim 1's requirement of "at least one transition event performed for at least one of a plurality of computer-related hardware devices."

82.    Kubernetes also does not include Claim 1's recited "transition event" (i.e., "an occurrence of a change") performed for "at least one of a plurality of computer-related hardware devices." For example, documentation provides that "Kubernetes abstracts common resources [(e.g., 'CPU, memory, GPUs, etc')] for allocation to workloads and utilizes operating system primitives (for example, Linux cgroups) to manage consumption by workloads" and sees all "devices"              as              "infrastructure              resources."              *See*

https://kubernetes.io/docs/reference/glossary/?all=true#term-device;

https://kubernetes.io/docs/reference/glossary/?all=true#term-infrastructure-resource.

**Device**

One or more infrastructure resources that are directly or indirectly attached to your nodes.[-]

Devices might be commercial products like GPUs, or custom hardware like ASIC boards. Attached devices usually require device drivers that let Kubernetes Pods access the devices.

**Resource (infrastructure)**

Capabilities provided to one or more nodes (CPU, memory, GPUs, etc), and made available for consumption by Pods running on those nodes.Kubernetes also uses the term *resource* to describe an API resource.[-]

Computers provide fundamental hardware facilities: processing power, storage memory, network, etc. These resources have finite capacity, measured in a unit applicable to that resource (number of CPUs, bytes of memory, etc). Kubernetes abstracts common resources for allocation to workloads and utilizes operating system primitives (for example, Linux cgroups) to manage consumption by workloads).

You can also use dynamic resource allocation to manage complex resource allocations automatically.

Kubernetes cannot differentiate between physical hardware devices (i.e., "In cases when objects represent a physical entity, like a Node representing a physical host, when the host is re-created under the same name without deleting and re-creating the Node, Kubernetes treats the new host as the old one. . ."). *See* https://kubernetes.io/docs/concepts/overview/working-with-objects/names. This is so because "Kubernetes abstracts away the hardware infrastructure and exposes your whole datacenter as a single enormous computational resource ... [and this] allows you to deploy and run your software components without having to know about the actual servers underneath." *See* https://gist.github.com/madhub/af18086cc01fdba1ea03893063e3de87. As another example, documentation explains that when Kubernetes detects that a pod running on a node has failed, Kubernetes is detecting a software event (the termination of a containerized process), not a change to any physical hardware device. *See* https://kubernetes.io/docs/concepts/workloads/pods/pod-lifecycle/. As such, Kubernetes only involves precisely the type of "update to a program or software to a computer" or "change to a data element" that the patentee expressly disclaimed

multiple times during prosecution of the 124 Patent. *See, e.g.*, Patentee's Office Action Response dated 2/18/2009 at 15 (Ex. 8) ("Applicant respectfully submits that a software program is not a computer-related hardware device that includes a processor, as claimed"); 12/09/2010 Patentee/Appellant Reply Brief at 4 (Ex. 9) (asserting "an 'update to a program or software in a computer' or a 'change' to a 'data element' cannot be considered a 'transition event,' as claimed and described in [patentee's] specification.")

83.    At least because of the absence of the "receiving an indication of an occurrence of at least one transition event performed for at least one of a plurality of computer-related hardware devices," "recording information from the transition event into a centralized computerized database, " or "managing at least one additional transition event for at least one of the plurality of computer related hardware devices" as discussed above, HCSC does not directly infringe the 124 Patent, either literally or under the doctrine of equivalents.

84.    Likewise, at least because there is no direct infringement, HCSC does not indirectly infringe the 124 Patent, including no induced or contributory infringement of the 124 Patent.

85.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that HCSC infringes the 124 Patent, and thereby cause HCSC irreparable injury and damage.

86.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between HCSC and IV regarding whether HCSC infringes or has infringed the 124 Patent.

87.    HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that HCSC (including through its alleged use of the 124 Accused System and Kubernetes) does not infringe the 124 Patent.

28

## COUNT VI
## DECLARATION OF INVALIDITY OF THE 124 PATENT

88.     HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

89.     Each claim of the 124 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. § 1, et seq., including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112. More specifically, and without limitation, the claims of the 124 Patent are invalid under 35 U.S.C. § 101 for lack of patentable subject matter. The claims of the 124 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because they are anticipated or rendered obvious by relevant prior art, including but not limited to the prior art of record during prosecution of the 124 Patent, and/or additional prior art that will be identified during discovery in this case. The claims of the 124 Patent are also invalid under 35 U.S.C. § 112(a)/first paragraph because the specification does not contain a written description of the claimed invention sufficient to enable any person skilled in the art to which it pertains. The claims of the 124 Patent are also invalid under 35 U.S.C. § 112(b)/second paragraph because the claims do not particularly point out and distinctly claim the subject matter regarded as the invention.

90.     HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that the claims of the 124 Patent are invalid.

## COUNT VII
## DECLARATION OF NON-INFRINGEMENT OF THE 844 PATENT

91.     HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

92.     The 844 Patent is titled "Root Image Caching and Indexing for Block-Level Distributed Application Management." The 844 Patent's Abstract states:

> Described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology

29

involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

93.    IV has asserted that third-party software called Docker that IV alleges HCSC is using (the "844 Accused System") infringes the 844 Patent. 844 Claim Chart.

94.    Contrary to IV's assertions, HCSC has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 844 Patent, including through any making, use, offering to sell, selling, and/or encouraging the making, using, selling, offering to sell, and/or importation of the 844 Accused System or Docker, at least because the 844 Accused System and Docker do not employ, incorporate, use, or otherwise include all of the limitations of the 844 Patent's claims. IV's infringement contentions for the 844 Patent also fail to show any infringement by the 844 Accused System or Docker.

95.    Although there are additional reasons why HCSC, the 844 Accused System, and Docker do not infringe the 844 Patent, non-limiting examples are discussed below.

96.    IV has only identified independent claim 7 of the 844 Patent as asserted. Claim 7 recites:

> 7. A method for providing data to a plurality of compute nodes, comprising:
>    storing blocks of a root image of said compute nodes on a first storage unit;
>    storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and
>    caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

97.     With respect to the "leaf images" limitation recited in each independent claim of the 844 Patent, these "leaf images" include "only additional data blocks not previously contained in said[/the] root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes."

98.     IV alleges that as a part of the 844 Accused System "Docker stores leaf images including thin R/W layer in a runnable container for respective compute nodes," "Docker includes a writable per runnable container layer for new data such as new files and including a copy on write strategy for changes made to the blocks of the root image," and "Docker contains a writable layer using copy on write, leaving unchanged image data in their original image layers." Ex. 6 at 25; *see also*, *id* at 12, 20. According to IV, the thin R/W layer in a runnable Docker container layer (accused "leaf image"), the read-only layers in a Docker image layer (accused "root image"), and Docker's copy on write approach to the R/W layer that leaves unchanged data in the original image layer (accused "only additional data blocks not [] in [the root image] ... and changes made ... to the blocks of the root image," but "not []blocks of [the] root image that are unchanged") are illustrated by the figures below from the Docker documentation:



ubuntu:15.04

Container
(based on ubuntu:15.04 image)

Source: https://docs.docker.com/storage/storagedriver/.



Source: https://docs.docker.com/engine/storage/drivers/overlayfs-driver/.

*See, e.g.*, Ex. 6 at 16, 28.

99.    The Accused 844 System and Docker, however, do not infringe the 844 Patent's recited limitation of "leaf images" that includes "only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes." For example, documentation indicates that Docker's thin R/W layer in a runnable container (accused "leaf image") does not include only additional data blocks not previously contained in the read-only layers of a Docker image (accused "root image"), only changes made by respective compute nodes to the read-only layers of a Docker image and no blocks of the read-only layers of a Docker image that are

32

unchanged by respective compute nodes (accused "only additional data blocks not [] in [the root image] ... and changes made ... to the blocks of the root image," but "not []blocks of [the] root image that are unchanged"). Documentation states that modified files created in Docker's thin R/W layer contain the entire file from the read-only layers of a Docker image, not only the modified data for the file. *See* https://docs.docker.com/engine/storage/drivers/overlayfs-driver/. Indeed, the Docker figure that IV cites above specifically shows "file 2" from the read-only "image layer" (accused "root image") as being the "same file" contained in the read/write "container layer" (accused "leaf image"). *See id.* ("Where the image layer and the container layer contain the same files, the container layer (upperdir) takes precedence and obscures the existence of the same files in the image layer. . . . The image's layers are the lowerdirs in the overlay and are read-only. The new directory for the container is the upperdir and is writable."). *Id.* As another example of noninfringement, each independent claim of the 844 Patent also requires a plurality of "compute nodes." The 844 Patent specification explains "[i]n its most basic configuration, compute node 100 typically includes at least one processing unit 102 and memory 104." 844 Patent 4:29-31, Fig. 1. IV alleges that as a part of the 844 Accused System Docker "containers" correspond to the plurality of "compute nodes." *See* Ex. 6 at 3-4. The accused Docker containers (i.e., process/files/software), however, do not infringe at least because they are not "compute nodes" having a processor and memory. *See, e.g.,* https://docs.docker.com/get-started/docker-concepts/the-basics/what-is-a-container/ ("Without getting too deep, a VM is an entire operating system with its own kernel, hardware drivers, programs, and applications. Spinning up a VM only to isolate a single application is a lot of overhead. A container is simply an isolated process with all of the files it needs to run."); https://www.docker.com/resources/what-container/ ("A container is a standard unit of software . . .").

100. At least because of the absence of the "leaf image" and "compute nodes" as discussed above, HCSC does not directly infringe the 844 Patent, either literally or under the doctrine of equivalents.

101. Likewise, at least because there is no direct infringement, HCSC does not indirectly infringe the 844 Patent, including no induced or contributory infringement of the 844 Patent.

102. Absent a declaration of non-infringement, IV will continue to wrongfully allege that HCSC infringes the 844 Patent, and thereby cause HCSC irreparable injury and damage.

103. For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between HCSC and IV regarding whether HCSC infringes or has infringed the 844 Patent.

104. HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that HCSC (including through its alleged use of the 844 Accused System and Docker) does not infringe the 844 Patent.

## COUNT VIII
## DECLARATION OF INVALIDITY OF THE 844 PATENT

105. HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

106. Each claim of the 844 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. § 1, et seq., including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112. More specifically, and without limitation, the claims of the 844 Patent are invalid under 35 U.S.C. § 101 for lack of patentable subject matter. The claims of the 844 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because they are anticipated or rendered obvious by relevant prior art, including but not limited to the prior art of record during prosecution of the 844 Patent, and/or additional prior art that will be identified during discovery in this case. The claims

of the 844 Patent are also invalid under 35 U.S.C. § 112(a)/first paragraph because the specification does not contain a written description of the claimed invention sufficient to enable any person skilled in the art to which it pertains. The claims of the 844 Patent are also invalid under 35 U.S.C. § 112(b)/second paragraph because the claims do not particularly point out and distinctly claim the subject matter regarded as the invention.

107.    HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that the claims of the 844 Patent are invalid.

## COUNT IX
## DECLARATION OF NON-INFRINGEMENT OF THE 584 PATENT

108.    HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

109.    The 584 Patent is titled "System for Hosting Customized Computing Clusters." The 584 Patent's Abstract states:

> A computer system for hosting computing clusters for clients. The system includes clusters each including a set of computing resources and each implemented in custom or differing configurations. Each of the configurations provides a customized computing environment for performing particular client tasks. The configurations may differ due to configuration of the processing nodes, the data storage, or the private cluster network or its connections. The system includes a monitoring system that monitors the clusters for operational problems on a cluster level and also on a per-node basis such as with monitors provided for each node. The system controls client access to the clusters via a public communications by only allowing clients to access their assigned cluster or the cluster configured as per their specifications and performing their computing task. Gateway mechanisms isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separately.

(corrected by Certificate of Correction issued June 4, 2013).

110.    IV has asserted that third-party software called Kubernetes that IV alleges HCSC is using (the "584 Accused System") infringes the 584 Patent. 584 Claim Chart.

111.    Contrary to IV's assertions, HCSC has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly

35

(whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 584 Patent, including through any making, use, offering to sell, selling, and/or importing of the 584 Accused System or Kubernetes, at least because the 584 Accused System and Kubernetes do not employ, incorporate, use, or otherwise include all of the limitations of the 584 Patent's claims. IV's infringement contentions for the 584 Patent (Ex. 7) also fail to show any infringement by the 584 Accused System or Kubernetes.

112. Although there are additional reasons why HCSC, the 584 Accused System, and Kubernetes do not infringe the 584 Patent, a non-limiting example is discussed below.

113. IV has only identified independent Claim 1 of the 584 Patent as asserted. Claim 1 recites:

1. A computer system, comprising:
a private communications network linked to a public communications network;
a first cluster comprising a set of computing resources, comprising at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;
a second cluster comprising a set of computing resources, comprising at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and
a monitoring system to monitor operations of the first cluster and the second cluster for communications problems;
wherein the first configuration differs from the second configuration;
wherein the first configuration provides a first computing environment to perform a first client task and the second configuration provides a second computing environment to perform a second client task; and
wherein the computing resources comprise processing nodes, data storage shared by the processing nodes, and at least one communications network to link the processing nodes to each other and to the data storage;
wherein the first cluster establishes communications between the set of computing resources of the first cluster and a first gateway communicatively linked between the first cluster and the private communications network;
wherein the second cluster establishes communications among the set of computing resources of the second cluster and a second gateway communicatively linked between the second cluster and the private communications network;
wherein communications between the first cluster and the second cluster are isolated;

> wherein the first cluster is a high performance cluster; and
> wherein the second cluster is a high performance cluster.

(corrected by Certificate of Correction issued June 4, 2013).

114. Independent Claim 1 of the 584 Patent requires, *inter alia*, a first gateway communicatively linked between a first cluster and a private communications network, and a second gateway communicatively linked between a second cluster and the private communications network. 584 Patent 11:34-41 ("a first gateway communicatively linked between the first cluster and the private communications network [and] … a second gateway communicatively linked between the second cluster and the private communications network").

115. HCSC does not infringe the 584 Patent (including, for example, the independent claim identified in the preceding paragraph) at least because the 584 Accused System does not include a first gateway communicatively linked between a first cluster and a private communications network, and a second gateway communicatively linked between a second cluster and the private communications network.

116. The "kubernetes.io" website provides the following description of Kubernetes "Cluster Architecture" which make up the 584 Accused System. *See* https://kubernetes.io/docs/concepts/architecture/.

> The architectural concepts behind Kubernetes.
>
> A Kubernetes cluster consists of a control plane plus a set of worker machines, called nodes, that run containerized applications. Every cluster needs at least one worker node in order to run Pods.
>
> The worker node(s) host the Pods that are the components of the application workload. The control plane manages the worker nodes and the Pods in the cluster. In production environments, the control plane usually runs across multiple computers and a cluster usually runs multiple nodes, providing fault-tolerance and high availability.
>
> This document outlines the various components you need to have for a complete and working Kubernetes cluster.

117.    The "kubernetes.io" website provides the following diagram depicting the architecture of the 584 Accused System. *See* https://kubernetes.io/docs/concepts/architecture/.



118.    The "kubernetes.io" website provides that each "cluster" is connected to a "cloud provider api," and more specifically that each cluster is connected to the cluster via a "cloud controller manager" which resides, or forms a portion of, the cluster. *See* https://kubernetes.io/docs/concepts/architecture/.

119.    Notably, there is no component, whether residing in software or hardware, disposed between the cluster, but more specifically the cloud control manager, and the cloud provider api. *See* https://kubernetes.io/docs/concepts/architecture/.

120.    The "kubernetes.io" website does provide that a "gateway API" is an optional addon that may be applied to the 584 Accused System and may route and direct traffic between a plurality of clusters. *See* https://kubernetes.io/docs/concepts/services-networking/gateway/. One may equate this gateway API to the gateways as claimed in the 584 Patent.

121. However, the 584 Accused System only employs a single gateway API, if at all, to route and direct traffic between the plurality of clusters. *See* https://kubernetes.io/docs/concepts/services-networking/gateway/.

122. The 584 Accused System does not include a plurality of gateway APIs each dedicated to a specific cluster.

123. Accordingly, HCSC does not directly infringe the 584 Patent at least because the 584 Accused System does not include a first gateway communicatively linked between a first cluster and a private communications network, and a second gateway communicatively linked between a second cluster and the private communications network.

124. Accordingly, HCSC does not directly infringe the 584 Patent, either literally or under the doctrine of equivalents.

125. Likewise, at least because there is no direct infringement, HCSC does not indirectly infringe the 584 Patent, including no induced or contributory infringement of the 584 Patent.

126. Absent a declaration of non-infringement, IV will continue to wrongfully allege that HCSC infringes the 584 Patent, and thereby cause HCSC irreparable injury and damage.

127. For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between HCSC and IV regarding whether HCSC infringes or has infringed the 584 Patent.

128. HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that HCSC (including through its alleged use of the 584 Accused System and Kubernetes) does not infringe the 584 Patent.

## COUNT X
## DECLARATION OF INVALIDITY OF THE 584 PATENT

129. HCSC incorporates by reference paragraphs 1-37 as if fully set forth herein.

130.   Each claim of the 584 Patent is invalid for failure to comply with one or more of the requisite statutory and decisional requirements and/or conditions for patentability under the Federal Patent Act, 35 U.S.C. § 1, et seq., including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112. More specifically, and without limitation, the claims of the 584 Patent are invalid under 35 U.S.C. § 101 for lack of patentable subject matter. The claims of the 584 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because they are anticipated or rendered obvious by relevant prior art, including but not limited to the prior art of record during prosecution of the 584 Patent, and/or additional prior art that will be identified during discovery in this case. The claims of the 584 Patent are also invalid under 35 U.S.C. § 112(a)/first paragraph because the specification does not contain a written description of the claimed invention sufficient to enable any person skilled in the art to which it pertains. The claims of the 584 Patent are also invalid under 35 U.S.C. § 112(b)/second paragraph because the claims do not particularly point out and distinctly claim the subject matter regarded as the invention.

131.   HCSC therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., finding that the claims of the 584 Patent are invalid.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, HCSC respectfully requests the following relief:

1.   A declaratory judgment in favor of HCSC and against IV on HCSC's claims;

2.   A declaration that HCSC does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 081 Patent;

3.   A declaration that the claims of the 081 Patent are invalid;

4.   A declaration that HCSC does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 287 Patent;

5.    A declaration that the claims of the 287 Patent are invalid;

6.    A declaration that HCSC does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 124 Patent;

7.    A declaration that the claims of the 124 Patent are invalid;

8.    A declaration that HCSC does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 844 Patent;

9.    A declaration that the claims of the 844 Patent are invalid;

10.    A declaration that HCSC does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 584 Patent;

11.    A declaration that the claims of the 584 Patent are invalid;

12.    An order enjoining IV and those in privity with IV from asserting the 081, 287, 124, 844, and 584 Patents against HCSC and HCSC's affiliates, subsidiaries, representatives, agents, vendors, and customers;

13.    A finding that this is an exceptional case under 35 U.S.C. § 285;

14.    An order awarding attorney fees, expenses of litigation, and costs to HCSC; and

15.    Such other and further relief as the Court deems just and proper.

## **DEMAND FOR A JURY TRIAL**

HCSC demands a jury trial on all issues and claims so triable.

OF COUNSEL:

Jon Gurka
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
(949) 798-1331
jgurka@crowell.com

David P. Lindner
CROWELL & MORING LLP
300 N. LaSalle Drive, Suite 2500
Chicago, IL 60654
(312) 222-8123
dlindner@crowell.com

Dated:  April 23, 2026

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (# 3630)
222 Delaware Ave., Suite 900
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Plaintiff Health Care Service
Corporation*

42